## IN RE ESTATE OF MARY J. DAVIS, DECEASED.

## KATE E. SAVAGE v. MINNESOTA LOAN & TRUST COMPANY, EXECUTOR.[1]

April 11, 1919.

No. 21,077.

**Executor and administrator — claim for services — verdict sustained.**

1. Respondent filed a claim in probate court against decedent's estate for services rendered between April, 1903, and January, 1916, to be paid for out of decedent's estate after her death. *Held*, that the evidence justified the verdict of the jury that such a contract existed and that respondent is entitled to recover in the sum of $7,500.

**Same — when statute of limitations begins to run.**

2. The statute of limitations does not begin to run upon a claim for services, to be paid for out of decedent's estate, until her death.

**Same — amendment of claim.**

3. The claim as filed in the probate court was for services rendered between April 23, 1903, and January 20, 1916. Upon the trial in district court respondent was allowed, over objection, to amend her claim so as to show that such services were rendered between April 23, 1903, and January 20, 1913. The item of services was not in any manner changed. *Held*, not error.

[1] Reported in 171 N. W. 778.

Kate E. Savage filed a claim against the estate of Mary J. Davis, deceased, for services performed between April 23, 1903, and January 20, 1913, amounting to $9,150. The Minnesota Loan & Trust Company, as executor of the will of decedent, filed objections to the allowance of the claim. The matter was heard in the probate court for Hennepin county before Dahl, J., who allowed the claim in the sum of $3,000. From the order of the probate court both parties appealed to the district court for that county where the appeals were heard before Hale, J., and a jury which returned a verdict for $7,500. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, the executor appealed. Affirmed.

*Cray & Eaton* and *F. C. Harvey,* for appellant.

*John J. McHale* and *W. B. Anderson,* for respondent.

QUINN, J.

By this action the respondent, Kate E. Savage, seeks to enforce a claim against the estate of Mary Jennie Davis, deceased, for services rendered to her during her lifetime. The defense relied upon is that the services were rendered without any promise or agreement, express or implied, on the part of the deceased, to pay for the same; that the amount claimed is far in excess of the value of the services rendered, and that the statute of limitations had run. Respondent presented her claim to the probate court for $9,150. It was allowed to the extent of $3,000. Both parties appealed to the district court. Issues were joined, the cause tried to a jury and a verdict returned in favor of the respondent for $7,500. From an order denying appellant's motion for judgment notwithstanding the verdict or for a new trial, this appeal was prosecuted.

In April, 1903, and for several years prior thereto, Miss Davis resided with and kept house for her brother, William H. Davis, who was engaged in the oil business in Minneapolis. Neither had ever married. She was about 64 years of age, in poor health and wholly inexperienced in business affairs. On the twenty-second day of that month the brother lost his life in the explosion of an oil plant, leaving him surviving his sister and nephew as his sole heirs at law. By will he left the bulk of his property to his sister. The books, securities, papers and records were badly scattered, damaged or destroyed by the explosion. The two per-

sons named as executors in the will and several other employees also lost their lives in the explosion. The sister sought to have Mr. Davenport, who had been her brother's attorney, act as administrator with the will annexed, of the estate. He declined and under his advice she was appointed and qualified as such.

The brother's estate amounted to nearly $300,000, consisting of mortgages and real estate located in both Minnesota and Wisconsin. The sister was in need of a companion and assistant. Respondent was 57 years of age, in vigorous health, well informed, had considerable experience in business matters, had been a close friend and companion of decedent in her girlhood days and lived with her husband and five children in Minneapolis. She attended the funeral of Mr. Davis. Then she offered to assist and comfort her friend of former years and the early companionship was resumed.

In her complaint the respondent alleges that she rendered services for decedent, at her instance and request, between April, 1903, and January, 1916, for the period of 61 months, in looking after her pecuniary affairs, advising her in relation to her property, assisting in looking after her brother's estate and aiding and comforting her as a companion, and that decedent promised to pay her the reasonable value therefor out of her estate at her death.

That the two women were very fond of one another was conclusively shown by the correspondence that passed between them from time to time, and there is no controversy but that the respondent was extremely patient and kind to the deceased during all the time in question. The services rendered were not continuous. They may be divided into several periods of from three to fifteen months each. The first period continued for some eleven months, beginning in April, 1903. During this time there were several trips to Milwaukee. There was considerable trouble in settling for the lives of those who died in the explosion. The property was badly scattered and it required much work to get it in shape. This fell largely upon the respondent. She taught decedent how to draw checks and the like, was with her almost constantly. Their relations were such that the decedent would not advise with her attorney without the presence of respondent. The second period continued for four months, starting June 1, 1905, during which time decedent was at

her home in Minneapolis, and respondent was with her almost constantly as a companion and assisting her in every way. The third period was for nine months, beginning in September, 1905, during which there was one trip to Wisconsin. The fourth period was for eleven months, beginning in December, 1907. Decedent was seriously ill and respondent remained with her almost constantly until July, when they went to Waukesha and remained for about two months. Decedent was a very large, heavy person and had to be helped up and down steps and in every other way. The fifth period was for something over a year beginning October, 1909, when they went to Florida and remained until April. The entire 61 months were spent in much the same way as above outlined.

Decedent had suffered two strokes of paralysis, could talk but little and was very irritable. In November, 1913, the respondent procured the consent of the doctor for a leave of absence of a week or two. Shortly thereafter she was informed by the woman who took her place that she need not return. The respondent testified that she and Miss Davis were like sisters, and that this treatment made her sick; that she had served decedent for 61 months and that her services were of the value of $150 per month, no part of which had ever been paid.

Several witnesses gave testimony bearing upon the mutual agreement contended for between Miss Davis and the respondent. Mrs. Bryden, of Milwaukee, testified as to conversations had with the deceased in 1903, 1904 and 1905, and in California in 1912, to the effect that decedent told her that she considered Mrs. Savage her very best friend, one on whom she could depend at any and all times; that Mrs. Savage knew all about her affairs and had been a great help to her after her brother's death; that her husband did not get a very large salary, but that her children would never have to take care of her. She also testified that in 1912 while in California Miss Davis had a stroke of paralysis; that one of her first requests was that Mrs. Savage should be informed of her condition; that when she passed away she expected Mrs. Savage to be with her; that she talked a great deal about Mrs. Savage, saying that she had been a sincere friend and would be well compensated for all she had done for her; that witness wrote many letters to Mrs. Savage for decedent as to her condition.

The witness Effie Parsons Davis testified that she knew decedent well for about ten years; that decedent said to her: "Your attitude towards me has let me know that you think that I am taking up too much of Mrs. Savage's time;" that witness said she certainly thought she had; that at one time Mrs. Savage was almost a nervous wreck; that her ankles and feet had given away from running up and down stairs and waiting on her, and that she did not think a woman had any business taking so much of another individual's time; that decedent answered: "Well, my dear  *  *  *  that is your attitude, but  *  *  *  I have a perfect right to Mrs. Savage's time.  *  *  *  She knows that I have left her something after my death." In 1908, in decedent's sick room, witness had another conversation with her about which she testified that decedent said: "Well, I have quite forgiven you for your attitude  *  *  *  the way you feel about Mrs. Savage." Witness stated that she did not know of the relation that existed between Miss Davis and Mrs. Savage, and decedent said: "You know Mrs. Savage knows just how I feel and she is dearer to me than a sister could ever be; I don't think I could think as much of my own sister as I do of her. I have amply provided for Mrs. Savage after my death and I think that I am entitled to her time."

Harriet E. Pond testified that she was 80 years old and first knew Miss Davis in Joliet, Illinois, in 1849; that they were intimate friends; that they renewed their acquaintance about ten years before Miss Davis' death in Minneapolis; that she had a conversation with her concerning Mrs. Savage and she said: "I have been sick a long time but Mrs. Savage is the best friend I ever had.  *  *  *  But for her I should have been laid away long ago. Her kind attention and care has saved my life;" that witness said to her: "Mary  *  *  *  have you anything fixed?  *  *  *  Is there anything in regard to Mrs. Savage?" and she answered: "Yes, I want you to remember this: As remuneration for what Mrs. Savage has done for me I will give her this home when I am laid away;" that she said that over two or three times and that she said: "Judge Collins has made out the papers so that everything will be all right."

The witness Anna W. Leighton testified that she was a neighbor of William H. Davis and Mary J. Davis, attended his funeral after the explosion, shortly afterward had a conversation with Miss Davis who

talked of being friendless and alone, except for Mrs. Savage, and that she spoke of the Mitchell boys, that she thought she would help them some and Mrs. Savage.

The witness Augusta Connor testified that she was with Mary J. Davis as a companion at her house in the summer of 1908 and the summer of 1909; that she met Mrs. Savage there frequently, about three times a week; that Mrs. Savage called every time Miss Davis wanted her; that she called her over the telephone to talk over business affairs; that she became lonesome and wanted to talk of the old matters again; that Miss Davis said to her in a conversation concerning Mrs. Savage during the first summer that she would be amply rewarded for all the time she had given her; that she always considered her her best friend and told her over and over that she was dear to her as a sister, and that she was perfectly delighted when Mrs. Savage came and sorry when she went.

Benjamin Davenport testified that he had done business for William H. Davis as a lawyer and had attended his funeral; that on April 28, 1903, he became attorney for his estate, continuing as such until December, 1903; that he acted as Miss Davis' attorney after that until the first day of September, 1907, when she became angry at something, asked for his bill, paid it and took away all papers relating to her work; that he had never seen Mrs. Savage until the Tuesday following the explosion; that Miss Davis introduced her to him as a "very near, dear friend, school girl acquaintance, * * * a business woman of capacity and experience * * * that she was going to have the benefit of her advice and assistance during those troubled times." He also testified that she asked him if he were willing to act as administrator of the estate; that he asked her if her brother had ever told her how much he was worth and that she said he was worth $300,000; that he answered: "From what I see of the destruction of that explosion and what I know of his property I don't think there is more than $75,000 left, and if * * * that estate in your opinion should dwindle from $300,000 to $75,000;" that he declined the offered position and Miss Davis said: "If there is $75,000, I don't think I am going to live long, there will be enough left in my estate to pay the Brydens and Mrs. Savage for all they do for me;" that that was the substance of the conversation. He

testified that the next time he went to see her she informed him that she was going to act as administrator and that she would like to have him as attorney for the estate; that he answered that by saying he would act as such, provided no money or property of any kind should come into his hands; that she said she and Mrs. Savage would look after their own interests, her own interest, and with that understanding he agreed to be attorney for the estate and from that time acted as such; that he visited that house or she came to his office daily during that year; that he saw Mrs. Savage there and if she wasn't there he waited until she got there.

Decedent died on March 4, 1915, without having made any provision by will or otherwise for the payment of respondent for the services rendered as herein contended for.

It is urged that the testimony of Mr. Davenport was privileged. With this contention we do not agree. The witness, while testifying, was exceedingly careful not to disclose any matters or conversations had with deceased after his employment as attorney. He testified positively that the conversations were prior to any thought of his being employed as counsel and had to do with matters entirely outside of his employment.

The testimony, in our opinion, was amply sufficient to support the finding of the jury that a contract of employment did exist between the deceased and the respondent.

While the amount of the verdict may be somewhat large yet it was justified by the testimony bearing thereon. It is clear that the services were of a very high order and very beneficial to decedent. We are satisfied that the verdict should not be interfered with.

There is no force in the contention that the statute of limitations had run on the claim, or any part thereof, at the time of the bringing of this action. The action did not lie until after the death of decedent. All of the testimony bearing upon that phase of the case was to the effect that the claimant was to receive compensation for her services out of decedent's estate after her death. In re Hess Estate, 57 Minn. 282, 59 N. W. 193.

There is nothing in the contention that the court erred in allowing the amendment of respondent's claim upon the trial. The amendment

in no way changed the character or amount of the demand. As it was filed in probate court the claim was for services rendered between April 23, 1903, and January 20, 1916. The evidence showed them to have been rendered between April 23, 1903, and January 20, 1913, and the court allowed the amendment of the claim to correspond with the proofs as to the dates. Stuart v. Stuart, 70 Minn. 46, 72 N. W. 819.

Order affirmed.